UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| Tonisha M. Pinckney, Ph.D. | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )  Civil Action No. 4:19-cv-40055 |
| | ) |
| Anna Maria College, | ) |
| *Defendant*. | ) |

COMPLAINT AND DEMAND FOR JURY TRIAL

PARTIES

1. The Plaintiff, Tonisha Pinckney, is an individual residing in Worcester County, Massachusetts.

2. The Defendant, Anna Maria College, is a private, co-ed, college accredited by the New England Association of Schools and Colleges, with its principal place of business located at 50 Sunset Lane, Worcester County, Paxton, Massachusetts 01612.

STATEMENT OF JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court because it is a federal cause of action for violation of 29 U.S.C. 2601, also known as the Family and Medical Leave Act, 42 U.S.C. §2000 et seq., and 42 U.S.C. Ch. 126 §12101, et Seq., also known as The Amended Americans with Disabilities Act.

4. The Plaintiff has met all jurisdictional prerequisites to filing suit by filing the claim first with the Massachusetts Commission Against Discrimination/Equal Employment Opportunity Commission and then obtaining the Right-to-Sue.

5. Venue is proper in the central district because one or more parties to the action reside in Worcester County and all events giving rise to the cause of action occurred within Worcester County.

STATEMENT OF FACTS

6. Dr. Pinckney is an adult African American woman.

7. Dr. Pinckney is a highly qualified expert in the field of criminal justice and has been actively employed in the competitive field of higher education for criminal justice for many years. She is also an experienced educator and director.

8. As an administrator and director, she has a unique understanding of the complexities of running a criminal justice program in a competitive market. In addition to providing excellent instructors, curriculum, and resources to students, colleges, through its Director, must create, develop, and maintain strategic relationships in order to recruit students.

9. Specifically, most students that seek higher level degrees in the field of criminal justice are professionals working in the field and their education is often paid for by government grants and/ or by their employer. Thus, the success of the program is largely based on its reputation in the community and the strategic relationships forged between the college and local law enforcement agencies. In the City of Worcester, there are several colleges and universities and these relationships are especially critical to the success of the program.

10. Dr. Pinckney has extensive experience, skills, and abilities to develop inter-agency relationships with the local, state, and federal law enforcement agencies that are essential and vital to the success of such programs.

11. On or about April 5, 2016, Anna Maria College ("AMC") hired Dr. Pinckney as Director of Undergraduate and Graduate Criminal Justice Programs in the School of Justice and Social Sciences, with an additional ranking as Assistant Professor, on track for tenure. Later, she was given the additional title as Program Director of Law, Politics, and Society.

12. AMC has hundreds of employees.

13. AMC purports to be an equal-opportunity employer. It has initiated and publishes written policies regarding equal opportunity employment, harassment, discrimination, complaints/investigations of allegations that those policies have been violated, and retaliation for making an allegation that the policies have been violated or participating in an investigation of such complaints.

14. AMC purportedly charges its Human Resources division, and all management level employees, with the task of enforcing those policies.

15. Dr. Pinckney's base salary was seventy-five thousand dollars per year. With additional incentives, her total remuneration per year was one hundred and five thousand dollars per year. She also earned additional benefits, such as health insurance, and free tuition at the college for her and her children.

16. Dr. Pinckney's work product for the college was excellent. She received excellent performance reviews, and the program flourished based in large-part on her ability to forge strong relationships within both the Federal and Commonwealth law enforcement community. She was routinely sought out by local media for expert commentary on local and national news stories related to law enforcement issues.

17. Dr. Pinckney made the college aware that she had pre-existing disabilities due to injuries sustained in her knee and hip. Specifically, she was unable to walk stairs without great pain and difficulty.

18. Due to her disabilities, Dr. Pinckney asked for a reasonable accommodation. Specifically, she asked for an accessible classroom.

19. AMC did not provide the reasonable accommodations, and instead, scheduled Dr. Pinckney to teach in a classroom on the second floor of a building with no elevator. The tall stool that was purchased was removed from the classroom and could not be located. A replacement was not granted.

20. Dr. Pinckney again asked that a reasonable accommodation be provided, but was told she would not be provided with an accessible classroom, and that she would have to "tough it out."

21. Additionally, Dr. Pinckney has difficulty standing for long periods of time.

22. Dr. Pinckney requested another reasonable accommodation; specifically, she requested a chair for her classroom.

23. AMC purchased the proper chair upon hiring Dr. Pinckney. The chair was removed from the classroom and Dr. Pinckney was told multiple times that a chair would be provided, but none was provide for several months. Again she was told by AMC to "tough it out."

24. Shortly after starting work for AMC, Dr. Pinckney was shocked by the hostile behavior she was subjected to by white colleagues, both male and female. Specifically by way of example, and not limitation, a white female subordinate said "you will never be my boss."

25. That same employee continued a pattern of disrespect and insubordination. She refused to change offices when instructed to, ignored Dr. Pinckney's emails and phone calls, and generally refused to acknowledge Dr. Pinckney's position as her superior. At times, the same employee arranged department meetings (on and off-site) without inviting Dr. Pinckney meant to undermine Dr. Pinckney's decisions and strategic plans for the department.

26. Dr. Pinckney's white colleagues were not subjected to this hostile behavior.

27. Dr. Pinckney repeatedly complained to the Vice President of Academic Affairs (VPAA) who confirmed that Human Resources ("HR") was aware of the hostile and discriminatory behavior she was subjected to and requested assistance. She specifically communicated that the treatment was based on the color of her skin and pointed out how her white colleagues were not subjected to the same hostile behavior. Dr. Pinckney also reported the treatment to HR directly.

28. In response to her complaints, Dr. Pinckney was told that she would "look weak" if AMC intervened, and that she should deal with it directly, even though her repeated attempts to deal with it directly had failed. After complaining, Dr. Pinckney was met with increased hostility from her white colleagues.

29. In other instances, this same employee and other white employees would refuse to follow her instructions regarding the Criminal Justice programs. Specifically, they would say that Dr. Pinckney was only the "Director of Criminal Justice" not the "Director of all Criminal Justice Programs."

30. Once again Dr. Pinckney complained about the discriminatory behavior to her superiors and requested assistance.

31. In response to her complaint, Dr. Pinckney was discouraged from contacting Human Resources directly because it "makes you look weak" and because it would "make things worse." She specifically complained that the treatment she was receiving was based on the color of her skin. AMC offered no assistance, instead telling her that part of her leadership role was to handle things on her own. The VPAA assured Dr. Pinckney that HR was aware and that the VPAA was documenting and handling the issues with HR according to the policy.

32. Multiple white colleagues, both male and female, subjected Dr. Pinckney to insults on a regular basis. By way of example and not limitation, those insults included:
   - Calling her stupid;
   - Saying she was "not a real academic;"
   - Saying that she "will never be a leader;"
   - Saying that she "was not going to last;"
   - Saying that she "should not be the face of the program;"
   - Telling her to "shut-up" with hands put up to her face
   - Telling her that she "has no right to tell anyone what to do;"
   - Accusing her of "self-promoting;"
   - Calling her a "horrible leader."
   - Constantly challenging whether she could read and understand the topics

33. These are just examples of the discriminatory behavior Dr. Pinckney would be subjected to on a weekly, if not daily, basis.

34. Although these interactions occurred in multiple scenarios, there was one particular problem at AMC that often triggered these harsh, unprofessional, and discriminatory insults.  Specifically, there were three tenured professors and one program director at AMC that were not performing up to standards.  They routinely skipped classes altogether, requiring Dr. Pinckney to cover those classes.  When she covered the classes, she discovered that the curriculum was not being followed and that the students were not adequately prepared.

35. Dr. Pinckney confronted each of the three about the problem.  One professor, who is black, accepted her feedback and improved his attendance and performance, but he did need subtle reminders from time-to-time, which he handled professionally.

36. The VPAA and Associate VPAA (AVPAA) insisted that Dr. Pinckney handle the black professor "strictly."  Dr. Pinckney asked repeatedly why her complaints and those of students were not drawing the same disciplinary attention for the white professors who demonstrated more grievous behaviors than for the black professor.

37. When it was revealed that the black professor had cognitive (executive function) disabilities, the AVPAA strongly suggested to Dr. Pinckney that she assess whether he had the ability to do his job.  Dr. Pinckney strongly asserted that he did have the capability of continuing in the position and suggested that AMC offer accommodations.

38. Dr. Pinckney cautioned the AVPAA against "pushing him out" since the others where never formally disciplined.

39. The two other professors, both of them are white, were belligerent and non-responsive when Dr. Pinckney tried, without support, to rectify the issues within the department concerning excessive absences, decreased work performance, and student complaints.

40. When Dr. Pinckney tried to discipline the two white professors and the white director of forensic criminology at the Molly Bish Center and/or suggest changes to improve the program, she was met with harsh insults and fierce insubordination from the white colleagues as partially described above.

41.  In response to this treatment, she was told that the black instructor should be "written up." Dr. Pinckney was told to do this even though his performance had improved and he was responsive and respectful of her position.  She was told not to worry about the two white professors because "it was being handled."

42. Dr. Pinckney specifically asked Judith Kenary and Chris Holmes, in writing, why the black professor should be disciplined but not the others.  They did not respond.

5

43. In other words, the harassment was most often instigated by Dr. Pinckney's efforts to exercise appropriate direction and control over the program and her subordinates (who were performing poorly) within the program.

44. Again, Dr. Pinckney repeatedly complained about the issues to the VPAA, AVPAA, and HR and requested assistance.  She specifically complained that the treatment was based on the color of her skin.

45. Dr. Pinckney described the treatment as "hostile" and "toxic" during discussions and emailed letters as early as a few weeks after beginning the position in 2016.

46. In response to these complaints, AMC took no action.  Instead, Dr. Pinckney was told to "woman up;" "stop wearing your feelings on your sleeves;" and "good leaders don't let people get to them."  The HR director also commented that she "wrote a book" and should know how to handle these issues.

47. The above comments were made after Dr. Pinckney revealed to the HR director that she was diagnosed with major depressive disorder and the workplace harassment triggered depressive episodes and anxiety attacks when coming to the college.

48. Dr. Pinckney also told the HR director that she was seeing a therapist to specifically discuss the toxic and hostile work environment and it's impact on her mental health and physical health.

49. Previously, and in the aforementioned meeting with the HR director, Dr. Pinckney discussed how the issues in the workplace exacerbated her blood pressure and other physical health issues.  Dr. Pinckney was met with resistance, disbelief, and no other options.

50. The HR director subsequently gave Dr. Pinckney a letter marked "confidential" stating that it was her duty as a leader to address the concerns and file a disciplinary report against the white professors and director, as well as the previous Dean. The letter also stated that HR did not believe the issue was related to race or gender.

51. Upon leaving for the day, the letter was left on Dr. Pinckney's office desk.  When she returned to work, the letter was no longer on her desk and requests for a duplicate were ignored.

52. Despite the constant insubordination and harassment, the program flourished thanks to Dr. Pinckney's excellent work.  She was re-appointed to her position in April of 2017 and received an excellent performance review in December of 2017 and a letter reappointing her to the Director position.

53. Shortly after the December 2018 performance review, Dr. Pinckney notified AMC of two things. First, that she was suffering severe emotional distress from the harassment, discrimination, and insubordination. Specifically, she was suffering from panic attacks, sleeplessness, extreme stress, exacerbation and stress-induced-recurrence of prior illnesses she suffers from (such as Lupus and Pulmonary Hypertension) and depression. She has been seeing a professional therapist since October 2017, in order to deal with stress caused by work-place harassment and discrimination. There was no remedial action taken by AMC.

54. Second, Dr. Pinckney complained to HR about a colleague, in writing, that would frequently yell at her at work, stalked her on social media, discussed personal and confidential information about her with her colleagues, interfered with her decisions as the Director of the program, and frequently allowed her subordinates to circumvent her authority. Dr. Pinckney specifically provided multiple examples of his hostile behavior and told HR that his behavior was "intolerable." AMC took no action.

55. In November 2017, Dr. Pinckney was hurt while performing the normal duties of her role. A student "mistakenly" pushed Dr. Pinckney causing her to fall to the pavement, hitting her knee and head on the pavement.

56. In trying to seek medical attention, the HR director communicated that it was Dr. Pinckney's obligation to seek treatment and give the bills to the HR department. HR did not provide Workman's Compensation (WC) information and informed HR that doctors would not see her using her regular health insurance since it was a WC case.

57. Dr. Pinckney was taken out of work by her doctors related to the injuries from the fall and the impact the work environment was having on her health.

58. During that time, Dr. Pinckney received numerous calls from HR claiming she may be too sick to come back to work. Which Dr. Pinckney adamantly denied.

59. The Friday night before Dr. Pinckney was to return to work on Tuesday for the start of the semester, the HR director emailed Dr. Pinckney to inform her that she could not come back to work until she provided a note clearing her to return.

60. Dr. Pinckney asked why a note was needed since the original letter was for two weeks and it had already been over three weeks. Again, she was out due to Winter break once the two weeks were up. Also, Dr. Pinckney continued to grade papers, issue and grade final exams, and work with students remotely during that time.

61. Dr. Pinckney provided the letter and also asked for WC information since she was still on crutches from the on-campus injury on or about November 6th 2017.

62. During her absence, which was also a time period where AMC was on Winter break and Dr. Pinckney was not required to work, Dr. Pinckney received calls and emails from adjuncts she hired for the Spring semester stating that someone cancelled their contracts.

63. The AVPAA, VPAA, and the HR director did not respond to her requests.

64. The white male director of online education, who had previously told Dr. Pinckney to "shut up" with his hands raised to her face, made changes without Dr. Pinckney's consent and hired his wife and daughter to fill the positions.

65. After making these complaints, Dr. Pinckney was shocked to learn on January 16, 2018, that her re-appointment to the Director position was rescinded. She learned that she was being re-appointed as an Assistant Professor, but that she was being demoted from her position as Director. This demotion was entirely inconsistent with her performance review and re-appointment from just a month earlier.

66. She was also told that the reason was partially attributed to complaints from the white male director of online education – the same individual who Dr. Pinckney formally complained about in October and November 2017.

67. Dr. Pinckney was not given a list of complaints or offered and opportunity to discuss the issues.

68. When Dr. Pinckney requested such, she was told that "it is already done" and that "there is no point going over the issues since you will try to talk yourself out of it or place the blame on [director of online education]."

69. Dr. Pinckney remarked how it was strange that her complaints went unanswered or unaddressed for almost two years. However, since the latest discussion with HR about the discrimination and hostile treatment and her fall on campus, she is now being demoted.

70. The VPAA and AVPAA responded that "this is not an HR issue" and "HR has nothing to do with this." They once again reminded her that "it is done."

71. Dr. Pinckney asked for an appeal process to which she was told that there was none and the President of AMC was aware.

72. Dr. Pinckney has never been reprimanded or subjected to discipline at AMC.

73. Feeling overwhelmed, Dr. Pinckney had a panic attack which required her to leave campus and go to the doctor with a blood pressure of approximately 152/120.

74. After learning of her demotion, Dr. Pinckney obtained counsel who alerted AMC formally of her complaint of discrimination, harassment, and retaliation. There was no remedial action taken by AMC.

75. As referenced, on or about November 6, 2017, Dr. Pinckney fell on AMC property and suffered grievous neurological (Post-Concussive Syndrome) and orthopedic injuries requiring hip replacement, knee replacement, and therapeutic treatment to her back. As a result of the injuries, she was temporarily unable to work.

76. While out on medical leave, the harassment continued. Her name-plate was removed from her door. She was denied access to her emails and forbidden from returning to work in order to retrieve personal items.

77. Dr. Pinckney complained about this treatment, through her counsel, to AMC. AMC took no remedial action.

78. Dr. Pinckney filed a worker's compensation claim and requested reasonable accommodations from AMC.

79. An accommodation meeting took place on or about April 11th, 2018.

80. In that meeting, specifically, she notified AMC that she would need to work from home or arrange for another reasonable accommodation because her knee needed to be replaced (on April 30th), and that she could and would return to work as soon as that procedure, and the subsequent rehabilitation, was completed.

81. During a meeting with HR to discuss accommodations, the HR director insisted that the AVPAA attend the meeting. Dr. Pinckney told the HR director that since the discussions discussed her health and mental health status, she did not feel comfortable discussing in front of her boss, especially since he had failed to address her previous complaints.

82. The HR director not only dismissed Dr. Pinckney's concerns but told her that if she did not attend the meeting as scheduled it would signal to "the college" that she was not willing to participate and could "jeopardize her employment.

83. During the meeting Dr. Pinckney asked for a copy of the prepared typed list of questions which the HR director and the AVPAA had. She was told that they were personal notes and they would take the request under consideration.

84. Dr. Pinckney also asked for their notes from the accommodation meeting so that she could confirm that the requested accommodations were notated correctly. Again, they said that they would take it under consideration.

85. Dr. Pinckney did not expect this process to take more than four-to-six weeks, so she scheduled the procedure during the summer break so that it would minimize any time away from work.

86. Because Dr. Pinckney could not provide an exact return date, AMC declared that she was seeking an "indefinite leave of absence" which was not true.

87. In fact, because of the college schedule, and per her contract, she does not work from Mid-May through September unless she is teaching additional courses for additional pay. She scheduled her procedure for April 30, 2018. At most, she needed approximately two-to-four weeks away from work for the knee replacement.

88. Nonetheless, and with full knowledge of Dr. Pinckney's work schedule and her ability to recover from the surgery when the college was not in session, AMC terminated her employment stating that "the College does not grant indefinite leaves of absence."

89. The termination letter was dated April 30, 2018, which was the date of Dr. Pinckney's knee replacement surgery. AMC did not wait for the outcome of the surgery or offer long-term disability options (which would not have been necessary).

90. Upon information and belief, other similarly situated colleagues outside of the protected class have been granted lengthy leaves of absence in order to deal with significant health issues.

91. Even after being wrongfully terminated, the harassment continued. Dr. Pinckney was not allowed to enter the building to retrieve her personal belongings. The locks on her office door were changed.

92. Subsequent to the termination, the white male director of online education was appointed to the position Dr. Pinckney held as Director of Undergraduate and Graduate Criminal Justice Programs.

93. After negotiating, with her counsel, AMC granted entry into the building. She was escorted by security staff who are also members of the Paxton Police Department, which was humiliating and demeaning. Specifically, she was "monitored" by an HR director, two maintenance workers, a police officer inside the building, and another police officer while outside the building.

94. As she inventoried her belongings, which had been packed into a box prior to her arrival, the HR officer stood over her in close proximity. Dr. Pinckney asked her to give her some space several times, which she refused. When Dr. Pinckney began tearing up and was about to cry, she took a chair and sat in the doorway instead of standing over her. Dr. Pinckney told the HR director that the treatment was not only demeaning as a criminal

justice professional but also triggered her anxiety – showing her how her hands were shaking.

95. While sitting in the chair, the officer made comments about Dr. Pinckney to the maintenance workers. The HR director then called someone on her cell phone (later saying it was her husband) and made comments about Dr. Pinckney to whomever was on the telephone with her.

96. Dr. Pinckney has never seen another individual, whether voluntarily or involuntarily terminated, treated like this at AMC. This was especially harsh since Dr. Pinckney was no threat and had not done anything to trigger such aggressive and demeaning treatment.

<u>PLAINTIFF'S CLAIMS AGAINST DEFENDANT
ANNA MARIA COLLEGE</u>

<u>COUNT I
VIOLATION OF 42 U.S.C. §2000 et seq.
DISCRIMINATION BASED ON RACE</u>

97. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

98. By the conduct alleged above, the Defendant discriminated against the Plaintiff, including but not limited to harassing her, creating a hostile work environment, and treating her differently than her white co-workers, eventually leading to her termination based on her race in violation of 42 U.S.C. §2000 et seq.

99. As a direct and proximate result of the Defendant's discriminatory acts, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

<u>COUNT II
VIOLATION OF 42 U.S.C. §2000 et seq.
RETALIATION</u>

100. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

101. By the conduct described above, the Defendant retaliated against the Plaintiff because she opposed practices forbidden by 42 U.S.C. §2000 et seq.

102. As a direct and proximate result of the Defendant's retaliatory acts, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of person and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

## COUNT III
## VIOLATION OF 29 U.S.C. §2601
## (FAMILY AND MEDICAL LEAVE ACT)

103. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

104. By the conduct described above, the Defendant violated 29 U.S.C. §2601.

105. As a direct and proximate result of the Defendant's violation of 29 U.S.C. §2601, the Plaintiff has suffered loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

## COUNT IV
## VIOLATION OF 42 U.S.C. Ch. 126 §12101, et Seq.
## (THE AMENDED AMERICANS WITH DISABILITIES ACT)

106. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

107. By the conduct alleged above, the Defendant discriminated against the Plaintiff based on her disability and failed to provide the Plaintiff with a reasonable accommodation for her disability in violation of 42 U.S.C. Ch. 126 §12101, et seq.

108. As a direct and proximate result of the Defendants violation of 42 U.S.C. Ch. 126 §12101, et seq., the Plaintiff has an continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional

opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

COUNT V
VIOLATION OF M.G.L. c. 151B
DISCRIMINATION BASED ON RACE

109. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

110. At all times relevant hereto, the Defendant has been and is an employer as that term is defined in M.G.L. c. 151B.

111. The Plaintiff is a member of a protected class (race) as defined in M.G.L. c. 151B.

112. By the conduct alleged above, the Defendant discriminated against the Plaintiff, including but not limited to harassing her, creating a hostile work environment, and treating her differently than her white co-workers because of her race in violation of M.G.L. c. 151B.

113. As a direct and proximate result of the Defendant's discriminatory acts, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

COUNT VI
VIOLATION OF M.G.L. c. 151B
DISCRIMINATION BASED ON DISABILITY

114. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

115. At all times relevant hereto, the Defendant has been and is an employer as that term is defined in M.G.L. c. 151B.

116. The Plaintiff is a member of a protected class (disability) as defined in M.G.L. c. 151B.

117. By the conduct alleged above, the Defendant discriminated against the Plaintiff based on her disability, including but not limited to failing to provide a reasonable accommodation in violation of M.G.L. c. 151B.

118. As a direct and proximate result of the Defendant's discriminatory acts, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

   WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

## COUNT VII
## VIOLATION OF M.G.L. c. 151B
## RETALIATION

119. The Plaintiff repeats and incorporates herein the foregoing paragraphs as if each were set forth here in its entirety.

120. At all times relevant hereto, the Defendant has been and is an employer as that term is defined in M.G.L. c. 151B.

121. By the conduct alleged above, the Defendant retaliated against the Plaintiff, including but not limited to firing her in retaliation for her opposing practices forbidden by M.G.L. c. 151B.

122. As a direct and proximate result of the Defendant's retaliatory acts, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

   WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

## COUNT VIII
## VIOLATION OF M.G.L. c. 151B
## INTERFERENCE WITH RIGHT TO BE FREE OF DISCRIMINATION

123. The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein in its entirety.

124. At all times relevant hereto, the Defendant has been and is an employer as that term is defined in M.G.L. c. 151B.

125. By the conduct alleged above, the Defendant coerced, intimidated, threatened, or interfered with the Plaintiff's enjoyment of the right to be free of unlawful discrimination, and acted in deliberate disregard of the Plaintiff's rights, in violation of M.G.L. c. 151B, §§ 4(4A).

126. As a direct and proximate result of the Defendant's violations of M.G.L. c. 151B, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

## COUNT IX
## VIOLATION OF M.G.L. c. 151B
## AIDING AND ABETTING UNLAWFUL ACTS

127. The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein in its entirety.

128. At all times relevant hereto, the Defendant has been and is an employer as that term is defined in M.G.L. c. 151B.

129. By the conduct alleged above, the Defendant aided, abetted, incited, compelled, or coerced, or attempted to do so, others in acts forbidden under M.G.L. c. 151B, in violation of M.G.L. c. 151B, §§ 4(5).

130. As a direct and proximate result of the Defendant's violations of M.G.L. c. 151B, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering

WHEREFORE, the Plaintiff demands judgment against the Defendant for the above-described compensatory damages, punitive damages, plus interests, costs, and all other remedies this Court deems just and fair.

JURY DEMAND

The Plaintiff requests a trial by jury on all claims as set forth herein.

    Respectfully Submitted,
The Plaintiff,
By her attorneys,
KJC Law Firm, LLC


**/s/ James W. Duffy**
John T. Martin
BBO # 676344
jmartin@kjclawfirm.com
James W. Duffy
BBO # 699647
jduffy@kjclawfirm.com
1 Exchange Place
Worcester, MA 01608
(617) 720-8447